E-FILED
Thursday, 06 October, 2005  02:15:12 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Oai Nguyen, | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | Case No. 03-4076 |
| | ) | |
| IBP, Inc. and Tyson Foods Inc., | ) | |
| Defendants | ) | |

**ORDER**

The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me.  Now before the court is the defendant Tyson Foods Inc.'s[1] motion for summary judgment (Doc. # 37) and Plaintiff's Motion to Strike (Doc. #40).  For the following reasons, the motion for summary judgment is granted to the extent stated herein, and the motion to strike is denied.

**SUMMARY JUDGMENT GENERALLY**

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be entered if and only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a

---

[1] The summary judgment motion, filed solely by Tyson, states without reference to any evidentiary support that Tyson was "improperly named" as IBP and that IBP has been purchased by Tyson Foods.  No motion has been filed addressing this issue, and IBP remains a named party to this litigation.  This matter needs to be resolved promptly, if not by agreement of the parties, then by motion of the defendant(s).  For purposes of discussion in this Order, the Court refers to plaintiff's employer as Tyson.

matter of law. See <u>Jay v. Intermet Wagner Inc.</u>, 233 F.3d 1014, 1016 (7th Cir.2000);  <u>Cox v. Acme Health Serv.</u>, 55 F.3d 1304, 1308 (7th Cir. 1995).

In ruling on a summary judgment motion, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).  The court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe.  <u>Waldridge v. American Hoechst Corp.</u>, 24 F.3d 918, 922 (7th Cir.1994).  The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.

The court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-movant, <u>Erdman v. City of Ft. Atkinson</u>, 84 F.3d 960, 961 (7th Cir. 1996); <u>Vukadinovich v. Bd. of Sch. Trustees</u>, 978 F.2d 403, 408 (7th Cir. 1992), cert. denied, 510 U.S. 844 (1993); <u>Lohorn v. Michal</u>, 913 F.2d 327, 331 (7th Cir. 1990); <u>DeValk Lincoln-Mercury, Inc. V. Ford Motor Co.,</u> 811 F.2d 326, 329 (7th Cir. 1987); <u>Bartman v. Allis Chalmers Corp.</u>, 799 F.2d 311, 312 (7th Cir. 1986), cert. denied, 479 U.S. 1092 (1987), and construing any doubts against the moving party.  <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970);  <u>Trotter v. Anderson</u>, 417 F.2d 1191 (7th Cir. 1969); <u>Haefling v. United Parcel Serv., Inc.</u>, 169 F.3d 494, 497 (7th Cir.1999).  The existence of "some alleged factual dispute between the parties," or "some metaphysical doubt," however, does not create a genuine issue of fact. <u>Piscione v. Ernst & Young, L.L.P.</u>, 171 F.3d 527, 532 (7th Cir.1999). The proper inquiry is whether a rational trier of fact could reasonably find for the party opposing the motion with

respect to the particular issue. See, e.g., <u>Jordan v. Summers</u>, 205 F.3d 337, 342 (7th Cir.2000).

The parties must identify the evidence (i.e. those portions of the pleadings, depositions, answers to interrogatories, admissions, affidavits, and documents) that will facilitate the court's assessment.  <u>Waldridge</u>, 24 F.3d at 922.  Thus, as Fed.R.Civ.Proc. 56(e) makes clear, a party opposing summary judgment may not rely on the allegations of her pleadings. Rather:

> [T]he adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

See, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  See also, Local Rule CDIL 7.1(D).


Neither the moving party nor the responding party may simply rest on allegations; those allegations must be supported by significant probative evidence tending.  <u>First Nat'l Bank of Arizona v. Cities Serv. Co.</u>, 391 U.S. 253, 290 (1968).  See also <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986)(when the moving party has met its burden, non-moving party must do more than show some "metaphysical doubt " as to material facts).  A scintilla of evidence in support of the non-moving party's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." <u>Anderson</u>, 477 U.S. at 250.

If the facts indicate that no reasonable jury could find for the party opposing the motion, then summary judgment must be granted.  <u>Hedberg v. Indiana Bell Tel. Co.</u>, 47 F.3d 928, 931 (7th Cir. 1995), citing <u>Anderson</u>, 477 U.S. at 248. 1995).  If the non-moving

party fails to make a showing sufficient to establish the existence of an element essential to that party and on which that party will bear the burden of proof at trial, then summary judgment is proper.  Celotex, 477 U.S. at 322; Waldridge, 24 F.3d at 920.

Although courts weighing summary judgment motions in employment cases must take special care not to invade the province of the fact finder, employment cases are governed by the same rules that govern any other summary judgment case, and they are equally amenable to summary disposition so long as there is no genuine dispute as to material facts.  Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997); Gonzalez v. Ingersoll Milling Machine Co., 133 F.3d 1025, 1031 (7th Cir. 1998). While intent and credibility are often critical issues in employment discrimination cases, there is no special version of Rule 56 that applies only to them.  See, e.g., Alexander v. Wisconsin Dep't of Health and Family Serv., 263 F.3d 673, 681 (7th Cir.2001); Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1396 (7th Cir.1997); Haugerud v. Amery School Dist., 259 F.3d 678, 689 (7th Cir.2001).  Summary judgment is not a substitute for a jury's determination about credibility.  Ashton v. City of Indianapolis, No.1562724, *1 -2 (S.D.Ind.,2003).

## UNDISPUTED FACTS

The following facts are taken from the parties' respective Statements of Fact and the responses thereto, unless otherwise noted.  Defendant's facility in Joslin, Illinois processes beef.  The plant has about 2,400 employees, operating two shifts known as the A shift or day shift and the B shift or night shift.  Workers on the "production floor" trim carcasses to produce finished meat products.

4

Hourly workers on the production floor are managed by approximately 17 Supervisors. Each of the two shifts has a General Supervisor (also called general foreman) to whom the Supervisors report. The General Supervisor reports to the shift's Superintendent for Production, who in turn answers to the Assistant Operations Manager, the Operations Manager, and the Complex Manager. In addition, there is a Complex Human Resources Manager, who at all pertinent times was Al Schuetze. The other positions were filled by various people at various pertinent times as stated below.

Plaintiff Oai Nguyen was hired in 1986. Nguyen's race is Asian and his national origin is Vietnamese. He began his employment as an hourly worker, progressing upward through the ranks (with dates of promotions shown in parentheses) as Production trainer (2/22/88), Assistant Supervisor Production (1/16/90), Supervisor Production (7/16/90), General Supervisor (12/16/94) and ultimately a Superintendent (5/6/96) over the production floor. Nguyen's employment was terminated on 6/24/96, based on a finding that he and his employees were misrepresenting yields.

Nguyen went to work[2] for two other employers (Murco and Cargill) until he was contacted by a friend, Paul Grueber, who was then working at the defendant's Lexington plant. Grueber told Nguyen that he could be considered for re-hiring at the Lexington plant. Nguyen applied for a position, stating that his reason for leaving Tyson had been a move to another state and listing only Cargill as an interim employer. He was hired at the Lexington plant as a Production Supervisor on 10/19/98.

_____

[2]Plaintiff asserts that these background employment facts are immaterial as they were not considered in any promotion or other employment decision. I conclude otherwise, finding that Plaintiff's employment history is material to this dispute, which centers in large part around his qualifications for various promotions.

Grueber transferred from Lexington to Joslin and then let Nguyen know that he would be welcome at the Joslin plant.  Nguyen was offered and accepted the job as a General Supervisor Production at Joslin on 2/7/00.  His job class was upgraded with a pay increase on 8/16/00.

On October 27, 2000, an opening for a Superintendent position at Joslin was posted, listing requirements for the position[3] as well as job duties[4].  Nguyen was one of four people to submit an application.  His application noted his service as a Production Superintendent in 1995-1996 but did not mention his termination.  It listed his experience at Murco and Cargill and detailed his most recent experience at Tyson.  The resume submitted with his application recited work-related training, and it stated that he "Graduated Business Management" from Illinois Central College, although he later admitted that he quit before obtaining a degree.

At least 3 other people applied for this position, including Tony Messenger. Messenger's resume showed that he had been employed at the Garden City Plant from 1981-1986.  He was re-hired in 1990 as a supervisor, promoted to Assistant General Foreman in 1996 and to General Foreman in 1996.  He held the latter position at the time of his application.  His resume stated that his safety rating was 217 and his turnover 3%.

---

[3]Minimum requirements were a college degree or equivalent with 2 years supervisory or superintendent-trainee experience; product specification knowledge; ability to train and work with supervisors; excellent oral and written communication skills; and knowledge of USDA and OSHA regulations.

[4]Job duties listed were: maintaining and enforcing safety programs; controlling, estimating and forecasting expenses; determining manpower needs; enforcing company policies and procedures; overseeing functions, production and mechanical aspects; and submitting daily, weekly and monthly reports in a timely manner.

His shift (known internally as the Finney County A Shift) was ranked first in Yields for the preceding 4 years, and the schedule miss was in the 8-9% range.

The management personnel (John Bellis, Daimon Cundiff and Paul Vanwassenhove) responsible for making the promotion decision did not interview[5] Nguyen but rather based their decision on their existing knowledge of his past performance and his background.  They unanimously ranked Messenger above Nguyen, and Messenger was promoted to the position.  Messenger is White.

On Oct. 3, 2001, Nguyen was reviewed by James Lowry.  His overall rating was above average, but several goals were set for improvement in the areas of "Primal Yields, Labor Costs, Quality Audits, and Bid Aging, each of which was below the Division Average.

In January 2002, another Superintendent position was posted, with the same qualifications listed above.  At least 7 people applied for that position, including plaintiff and Mike Hancock.  Nguyen submitted a similar resume to the one he used in 2000, adding that his most recent experience with the company was 16 months as the Lexington "Assistance of General Supervisor" [sic] and as General Supervisor at Joslin.  He also showed that he had received a "Tyson Hero" award in 2001.  The resume also showed his promotion to the General Foreman position at Joslin, although it showed an incorrect date (March 1, 1999 instead of Feb. 7, 2000).

Hancock's resume showed his education (Associates' Degree, Bachelor's Degree, management courses), continuous employment from 1988 through 2002 by Tyson, 2 years

---

[5]Plaintiff makes much of the lack of interview for this position and others discussed below.  The lack of an interview does not negate the fact that the comments were made, and plaintiff does not otherwise dispute the fact that they were made.

as a Supervisor,10 years as a General Foreman, one year as a Quality Assurance Supervisor and several months as a Superintendent Trainee.  All of his ratings at his most recent review were average or above average, with the comment that Hancock had "a very bright future".

The 3 management personnel (John Bellis, Paul Vanwassenhove, and Mona Melton) interviewed the candidates and concluded that Hancock was the better candidate for the position,  based on  his diverse employment history with the company and because his superintendent trainee position made him better suited for the position.  In addition, they concluded that Nguyen was not qualified at the time because he had not "held to" the goals that had been set for him, because he seemed less able to set goals for himself and his people, and because he "needed more time to develop his style of management".  Hancock was given the promotion effective in February of 2002, at which time he became Nguyen's Superintendent.  Hancock is White.

Another Superintendent position was posted on June 13, 2002.  Nguyen again applied.  The promotion decision was made by Plant Manager Todd Reed, Operations Manager Paul Grueber, and Assistant Operations Manager Paul Vanwassenhove.  At the time, the management team believed the plant was "chaotic" and they were looking for a way to improve its performance and to assess the competence of the managers.  The team decided to laterally transfer Marvin Peterson, a successful superintendent on the kill floor, into the A shift Superintendent Production position effective September 26, 2002.  Nguyen concedes that he was not as qualified as Peterson for this position.  Peterson is Black.

A General Foreman on the kill floor, Scott Kensinger, applied for Peterson's vacated position; apparently, the other applicants for the posted Superintendent position, including

8

Nguyen and Les Wade, were also considered for Peterson's slot without the need for re-application.  Kensinger, who is White, was promoted.  He had worked in the company's management from 1990 to 1993 as carcass Division Supervisor, then returned in 1998 for another year in the same position.  He was promoted to General Foreman of that Division from 1999 until his 2002 promotion, which was effective September 26, 2002.  His most recent evaluation rated him very high in all areas and concluded that he was "ready for the next step in management" and "would be a good person to promote".  On the other hand, Nguyen's most recent evaluation noted that he had "struggled meeting performance goals as a General Foreman." [6]

From May 13, 2002 until July 10, 2002, Plaintiff worked 12 hour shifts with no breaks or overtime pay.  When he tried to take breaks, Hancock would page him for no reason. When Nguyen tried to discuss the matter with Hancock, he was told that he had "better love it or you have a problem."  Nguyen claims that no other manager was required to work such long shifts without breaks, although there is evidence that all managers frequently worked 10-12 hours a day.

---

[6] The Plant Manager, Todd Reed, who was part of the decision team, also noted that he had hired three supervisors who had previously quit their jobs at Cargill while being managed by Nguyen; they had told Reed it was because of what they (and the plant manager at Cargill) perceived as Nguyen's tyrannical management style. Plaintiff moves to strike this testimony, arguing that it is hearsay.  That may be so, but the statement also falls within an exception to the hearsay rules:  Reed's statement is offered to show Reed's state of mind at the time the decision was made and not for the truth of the assertion.  For that limited purpose, the court has considered Reed's statement because he was a decision maker in this promotion decision.  See, Gorence v. Eagle Food Centers, Inc., 242 F.3d 759, 762 (7th Cir. 2001).  The motion to strike is denied.

On June 6, 2002, Nguyen was given an evaluation by Hancock. While Hancock noted that Nguyen used feedback to make positive gains in his area, he also noted that Nguyen needed to improve in a number of areas. The specific goals set for Nguyen were: reduce safety score from 366 to 300 or less; reduce labor costs to <$1.30>; score 87% or higher on quality scores, and improve primal yield to $15.00 and miscellaneous yield to -$10.00.

During the period when Hancock was his supervisor, Nguyen came to believe that Hancock was racist, in part because Hancock yelled at him every day in front of subordinates, mimicked his speech, and made fun of his stature. In addition, there were several incidents in which he and a supervisor below him were brought into Hancock's office to address a problem. Nguyen complains that he, rather than the supervisor responsible for the area with the problem, was yelled at and given a "Job Performance Violation." According to Nguyen, white supervisors were questioned in private and not berated in front of their subordinates. Hancock also became irate when a company nurse sent Nguyen home with a fever. Nguyen complained to Al Schuetze about these incidents.

He also complains about a change in office allocation. Hancock and Nguyen had shared an office. Hancock moved Nguyen out of that office as part of a re-assignment to place both A-shift and B-shift General Foremen in the same office and the A-shift and B-shift superintendents in the same office. According to Hancock and others, this was consistent with the practice at other plants and was designed to facilitate teamwork between the 2 shifts. According to Nguyen, it was racially motivated.

Hancock was moved to B-shift not long after Nguyen's complaints about him, although the transfer does not appear to have been related to those complaints.

In the late summer of 2002, Nguyen's name plate outside his office was taken down on several occasions by unknown persons and hung in a restroom or placed in other unsavory places. On one of these occasions someone told him the restroom was his new office. Each time, Nguyen reported the incident to personnel, and each time the company replaced the name plate. It is disputed whether any investigation was ever done, and no witnesses were located with any knowledge about the incidents. Nguyen believes that this was racially motivated, because he was the only one who was so targeted and he was the only Vietnamese. There is a dispute, however, about whether he ever stated to anyone at the time that he believed the incidents to be racial in nature.

Later in 2002, Nguyen prepared goals for himself that were similar but not identical to the goals Hancock had set, namely: safety <320; primal yield $18.00; miscellaneous yield -$10.00, and chain speed of 225 head/hour by 12/1/02. In November, he was reviewed by Peterson and given an average, "meets expectations" rating, with several comments that were less than positive. His future goals were set at: safety <300; primal yields $18.00; miscellaneous yields -$10.00, schedule miss reduced to 6%; reduction of downtime; and improved chain speed of 220. Between that review and the date of his discharge, Nguyen's shift failed to achieve these goals.[7]

---

[7]     The parties devote a significant amount of paper to discussing the errors that may or may not have gone into these indicia of plaintiff's performance. Any such errors, however, are irrelevant. If there were indeed errors, there is a total dearth of evidence suggesting that the errors were deliberately made or that discriminatory motive played any part whatsoever in them. In the absence of such evidence, this court will not peruse the math or decipher the manner in which yields, turnover and other statistics are calculated.

Two weeks after his November review, the company posted another superintendent job when Marvin Peterson was promoted to Assistant Operations Manager in Lexington, Nebraska. Nguyen did not apply for this position. He claims that he did not apply because when he went into the office to do so on Nov. 16, 2002, he was told not to apply because he was being demoted for poor performance. Darryl Terry was placed in the open Superintendent's position. Nguyen admitted that he was not more qualified than Terry. Terry is White.

His demotion was from his then-current position as General Supervisor Production to a Supervisor position. The demotion was determined by Paul Grueber, Todd Reed, and Rick Nimrick[8]. The demotion was to be effective 3 days later. He was told of his demotion by a group of senior managers including Peterson, Grueber, Vanwassenhove, and Allan Schuetze. Ordinarily, when someone is going to be demoted they are warned ahead of time that their performance is deficient and they are given time to improve. Nguyen was never warned that demotion was imminent during his reviews, even in light of all the criticisms.

At this meeting, Nguyen was advised that his salary would be reduced from $62,182 to an amount $1,500 above the highest paid production manager at the time; this amount was determined by reference to an old company policy. At about the same time, Tyson adopted a new salary policy regarding demotions, capping the salary of a demoted employee at the midpoint of the salary range for the new job classification. This amount

---

[8]Marvin Peterson is also listed by defendant as being in this group, but Peterson denied being any part of the decision-making group with respect to the demotion of Nguyen. For purposes of this motion, the dispute is immaterial.

was considerably less (apparently about $11,000) than what Nguyen had been told the cut would be at the meeting and at least $17,000 less than his current salary.  Management at the Joslin plant tried to obtain an exception for Nguyen; no general exception was granted but Nguyen was allowed to continue receiving the higher salary until December 10, 2002, instead of November 19, 2002.  Tyson cites to eleven other involuntarily-demoted employees between 1991 and 2004 whose salaries were cut upon the demotion, and further by affidavit states that no management employee had ever been demoted without a corresponding pay cut.  The pay-cut policy was revised at a later date to permit a demoted employee to receive the maximum pay rate for the new job classification.

Nguyen's position was filled by John Leyendecker, who was later discharged for failing to meet performance goals.  The General Foreman on B-shift for 2002 was demoted for poor performance, primarily because he failed to achieve sufficient yields.

Nguyen asked to take some vacation time, and he was permitted to do so.  He did not return to the plant after his vacation but instead was placed on medical leave on Dec. 6, 2002.  He had injured his left knee (not work-related) and developed arthritis in that knee.  It continued to present problems throughout 2002.  On July 9, 2002, his doctor provided him with a letter for work stating without any specifics that Nguyen needed to "limit stair climbing."  At his deposition, the physician stated that Nguyen was able to use the stairs "as his pain allowed" and that this was "something he [Nguyen] would have to monitor himself."  Nguyen took no time off work, even though the doctor asked him if he wanted time off and stated that she would have provided him an "off work slip" if he had so requested.  Nguyen claims he gave Hancock the note but Hancock completely ignored it and did nothing to alleviate his need to climb up and down stairs.  Indeed, Nguyen claims

13

that Hancock would often page him for no reason just so he would have to climb up the stairs.  One worker claims to have witnessed Hancock saying that Hancock told a female supervisor that he would "have some fun with this Vietnamese handicap" before paging him.  Hancock was also reported to have imitated Nguyen's limp.  After 3 weeks, Nguyen delivered the letter from his doctor to the human resources department on August 9, 2002, and complained about Hancock's conduct.  According to Nguyen, nothing was ever done. Hancock claims not to recall receiving the letter.

In January 2000, there was in effect an EEO Statement and Anti-harassment Policy Statement, prohibiting discrimination and harassment on the basis of race or national origin, as well as  a program called "Dignity and Respect.  Employees believing themselves to be victims of  behavior in violation of these programs were instructed to contact the EEO Coordinator at a specified 800 number.  Nguyen was aware of the contents of this policy and he attended multiple training sessions as part of these programs.  In addition, the Code of Conduct, signed by plaintiff in April of 2002, prohibited harassment and discrimination and provided procedures for reporting complaints about violation of the Code via an 800 number.  In July 2002, a new 'Harassment and Discrimination Policy was implemented. A new complaint procedure was provided.  An "Ethics Hotline" with an 800 number was part of the procedure.  The polices were posted in the plant, and employees were given annual training regarding harassment and discrimination.[9]

---

[9]No such training occurred in 2002 due to the Tyson-IBP merger.

14

At no time did Nguyen use internal company procedures to complain about racial harassment by employees at or below his level.  He did not complain about Messenger's or Peterson's promotions.

The only internal complaints he made were to his immediate supervisors and/or to human resources about Hancock's conduct.  The senior managers agree that complaints to one's immediate supervisors and/or to Human Resources was also a proper way to make a complaint.  There is also some question about whether the 800 number was in place at pertinent times.  He claims to have complained to Vanwassenhove and Schuetze about Hancock's general behavior on a number of occasions, but nothing ever changed.  He also complained to Chuck Sheddan about Hancock's failure to accommodate his knee injury, also to no avail.

On December 13, 2002, Nguyen filed his first charge of discrimination.  On June 14, 2003, Nguyen called the plant and told them he was not coming back to work.  This complaint was filed on November 10, 2003; an amended complaint was filed on June 18, 2004.   In his amended complaint, he asserts that he was harassed (Count II) and discriminated against (Count I) on the basis of his race and national origin, and that he was constructively discharged on June 11, 2003, in retaliation for his complaints of discrimination and harassment (Count III).

Defendant Tyson has moved for summary judgment as to Counts I and III in their entirety and in part as to Count II.  This Order follows.

## TITLE VII DISCRIMINATION CLAIM

A plaintiff's first step in pursuing a claim of discrimination is to file a charge with the appropriate agency, either the Equal Employment Opportunity Commission (EEOC) or the

15

Illinois Department of Human Rights (IDHR).  An EEOC charge must be filed  within 180 days after the unlawful employment practice occurred.  42 U.S.C. § 2000e-5(e)(1).  See, Beamon v. Marshall & Ilsley Trust Co., 411 F.3d 854 (7th Cir. 2005).  A claim filed with the IDHR must be filed within 300 days after the unlawful employment practice occurred.  Failure to timely file a charge precludes a subsequent Title VII lawsuit.  Id.  Defendant concedes that the 300 day limitations period applies here.  February 16, 2002, is the three-hundredth day prior to the filing of plaintiff's charge on December 13, 2002.

Discrete actions, such as  failure to promote  take place on date they occurred, even if such an action was part of an ongoing practice or connected to other acts.  Id., quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109-11 (2002).  Plaintiff's claims regarding the October 2000 and January 2002 promotions are untimely and cannot form the basis for liability.

In order to survive a motion for summary judgment, a plaintiff claiming discrimination must prove that (1) intentional discrimination (2) was more likely than not (3) the motivation (4) behind an adverse employment decision.  St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).

In the absence of direct evidence (which is lacking in this case), the case is evaluated using the burden-shifting analytical framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under that test, the plaintiff must first establish a prima facie case of discrimination, which creates a rebuttable presumption of discrimination.  The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action;  upon articulation of such a reason, the presumption of discrimination vanishes and the plaintiff must prove that the stated reason

16

is merely pretext for discrimination.  See, e.g., Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-56 (1981).  In fact, at this third stage, the plaintiff's burden under this shifting burden analysis "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination."  Id. at 256.  In other words, plaintiff's burden returns the plaintiff to the position she was in originally, namely the position of proving intentional discrimination.  Hicks, 509 U.S. at 510;  Nawrot v. CPC Internat'l, 277 F.3d 896, 905 (7th Cir. 2002).

A prima facie case of discrimination requires evidence that (1) plaintiff was a member of the protected class;  (2) plaintiff was qualified for the job in question or was meeting the employer's legitimate performance expectations;  (3) plaintiff suffered an adverse employment action; and (4) the employer treated similarly situated persons not in a protected class more favorably.  Bragg v. Navistar Intern'l Transp. Corp., 164 F.3d 373, 376 (7th Cir. 1998).

The first and third elements of the prima facie case are not disputed here. Plaintiff was a member of a protected class.  A demotion evidenced by a decrease in salary is an adverse employment action.  See  Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th cir. 1993);  Cheek v. Peabody Coal Co., 97 F.3d 200, 204 (7th Cir. 1996).  In this case, the dispute as to the second element is two-fold: was plaintiff was qualified for the promotions, and was he meeting legitimate expectations when he was demoted.  There is also a dispute about the fourth element.

In determining whether two or more individuals are similarly situated, the Seventh Circuit considers characteristics such as education, experience, performance, qualifications, and conduct. See,  Zaccagnini v. Charles Levy Circulating Co. , 338 F.3d

672, *675 -676 (7th Cir.2003); Balderston v. Fairbanks Morse Engine, 328 F.3d 309, 322 (7th Cir.2003); Radue v. Kimberly Clark Corp., 219 F.3d 612, 617 (7th Cir. 2000). Similarly situated employees must have the same supervisor, be held to the same standards, and have no differentiating or mitigating circumstances to distinguish their conduct or the employer's treatment of them.  Id. at 617-18.

Once a prima facie case is made out, and once defendant has proffered a lawful [i.e. "facially legitimate", see McDonnell Douglas, 441 U.S. at 804, quoted in Zaccagnini v. Charles Levy Circulating Co., 338 F.3d 672, 676  (7th Cir.2003)] reason for the employment action, the plaintiff must show evidence of pretext, which is more than a mistake or a decision based on erroneous facts;  the reason must either be a lie, a phony reason,  or it must completely lack a factual basis.  Adreani v. First Colonial Bankshares Corp., 154 F.3d 389, 395 (7th Cir. 1998).  Russell v. Acme Evans Co., 51 F.3d 64, 68 (7th Cir. 1995); Jordan v. Sommers, 205 F.3d 337, 343 (7th Cir. 2000).  To meet this burden, plaintiff must produce "significantly probative admissible evidence" from which it could be inferred that the employer's reason was false and that the actual reason was discriminatory.  Jones v. Union Pacific RR Co., 302 F.3d 735 (7th Cir. 2002); King v. Preferred Technical Group, 166 F.3d 887,892-93 (7th Cir.1999).  In the McDonnel-Douglas analysis it is permissible to assume the existence of a prima facie case and proceed directly to "pretext."  Olsen v. Marshall & Ilsley Corp., 267 F.3d 597, 600 (7th Cir. 2001);  Nawrot v. CPC Internat'l, 277 F.3d 896 (7th Cir. 2002)

A factfinder may infer pretext from the employer's untruthfulness, and evidence that calls truthfulness into question precludes summary judgment.  Perdomo v. Browner, 67 F.3d 140, 145 (7th Cir. 1995).  Inconsistent/contradictory explanations for the employment

action may place the employer's explanation in doubt, thereby precluding summary judgment.  Zaccagnini, at 676; O'Neal v. New Albany, 293 F.3d 998, 1005-06 (7th Cir. 2002).

If defendant believed certain facts and believed that its employment action was proper in light of those facts, it matters not whether that version of the facts was correct. Id.  The Court is not to sit in review of the action as some sort of "super-personnel department" but rather only reviews the actions of the employer to ascertain whether the actions violated Title VII.  Stewart v. Henderson, 207 F.3d 374, 378 (7th Cir. 2000); Nawrot v. CPC Internat'l, 277 F.3d 896 (7th Cir. 2002);  EEOC v. Armstrong World Ind., 185 F. Supp. 2d 932, 937 (C.D.Ill.2002).

At the summary judgment stage, it is important to remember that plaintiff need not prove her case.  She must, however, introduce evidence of facts that support her claims, and these facts need to be more concrete than her impressions or feelings.  "Facts, not an employee's perception and feelings, are required to support a discrimination claim." Uhl v. Zalk Josephs Fabricators, Inc., 121 F.3d 1133, 1137 (7th Cir. 1997).

With respect to the evidence (or lack thereof) supporting the prima facie case, the employer first asserts that plaintiff was not performing according to legitimate expectations. In fact, all the evidence in this record supports that proposition.  Each of his evaluations during the relevant time frame documents that he was not meeting the goals set for him by the employer; it is not the court's role to assess the fairness of those goals, and there is nothing in the record that would suggest that the goals were  unreasonable or illegitimate in any event.  None of plaintiff's evidence negates this failure; plaintiff's evidence simply challenges whether that failure was sufficient to support his demotion. Once again, it is not

19

the court's role to assess the "fairness" of the goals, so long as they were legal, nor is it the court's role to determine whether the failure to meet those goals was sufficient to support his demotion.  It is the plaintiff's obligation to produce evidence showing that he was in fact performing adequately well in the assessment of the employer, and the evidence directly contradicts any such assertion.

Moreover, plaintiff's case is wholly lacking in evidence of pretext.  Defendant's explanation for each promotion decision is that it selected the most qualified person for each position that was open.  A plaintiff faced with such an explanation has a significant burden to show that the differences between the candidate selected for the position and the plaintiff were "so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue."  Millbrook v. IBP, Inc., 280 F.3d 1169, 1180 (7th Cir.), reh'g and reh'g en banc denied (2002), cert. den. 537 U.S. 884 (2002).  The court must "respect the employer's unfettered discretion to choose among qualified candidates."  Id. at 1181.

In this case, the plaintiff's credentials were at best equivalent to those of the successful candidate for the various positions.  In not one of those decisions could it be said by a reasonable person that Nguyen was significantly more qualified.  Thus, even if plaintiff's prima facie case is conceded, the lack of cognizable evidence of pretext supports defendant's motion for summary judgment, and it is therefore granted as to the discrimination claim.

### TITLE VII HARASSMENT CLAIM

It appears from the pleadings that the Defendant's motion for summary judgment as to the harassment claim is limited: Plaintiff's claim based on Hancock's conduct is

20

conceded by defendant to present issues of fact.  Plaintiff responds by agreeing that Hancock's conduct is the only basis for his harassment claim, but he also points out that the harassment claim based on Hancock's conduct includes the medical issues and the name plate issues.  Defendant does not agree with this assessment, arguing that neither issue relates to Hancock.  Since both issues arose under Hancock's watch, however, I find that this is not a matter for judgment but rather an issue of the weight to be accorded to any such evidence.  The question will not therefore be decided in the context of summary judgment.

Since the harassment claim is limited to consideration of incidents that occurred during Hancock's tenure as plaintiff's superior, and since that period of time falls entirely within the 300 day period, nothing that occurred during his tenure is barred as untimely. And the other matters discussed by the parties (yelling by Ed Neary, Mona Melton, and John Bellis, for example) all occurred outside the time frame of Hancock's supervisory position.  They are not pertinent to the harassment claim.

To the extent that the plaintiff's harassment claim is based on conduct that did not occur during Hancock's tenure as plaintiff's supervisor, summary judgment for the defendant is proper.  If defendant's motion does in fact attack the harassment claim as it relates to events occurring during Hancock's tenure as plaintiff's supervisor, then the motion is denied.  The harassment claim based on that time period survives summary judgment and will proceed to trial.

## TITLE VII RETALIATION CLAIM

There are two distinct ways to prove up retaliation: a direct method and an indirect method.  These correspond to but differ slightly from the methods of proving a

21

discrimination claim.  Under the direct method, a plaintiff will survive summary judgment if he presents evidence that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two.  Luckie v. Ameritech, 389 F.3d 708, 714 (7th Cir. 2004).  Under the indirect method, plaintiff must show that (1) he engaged in statutorily protected activity; (2) he was performing his job according to legitimate expectations; (3) despite satisfactory performance, he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in protected activity.  Id.

In the record of this case, there is no direct evidence of retaliation.  First, assuming that his complaints about Hancock were protected and that his demotion was an adverse employment action, there is nothing but plaintiff's conjecture connecting the two events.  Not even timing will support such a claim - Plaintiff's  demotion occurred several months after his complaints about Hancock were voiced, and after Hancock left the supervisory position over Plaintiff - and there is no evidence suggesting that Nguyen's complaints had anything to do with Hancock's reassignment.

With respect to the indirect method, his case falters on the same issue as did his discrimination claim: he has produced no evidence that he was performing in satisfaction of the employer's legitimate expectations.  The failure to show an element of his prima facie case dooms the retaliation claim.

In the absence of evidence that the goals were set artificially high in order to discriminate or because of plaintiff's race or ethnicity, it is immaterial if other similarly situated employees were treated differently: plaintiff has failed to establish a prima facie

case and therefore cannot survive summary judgment.  The motion for summary judgment as to the retaliation claim is therefore allowed.

## CONSTRUCTIVE DISCHARGE

Plaintiff also claims that he was constructively discharged by his employer.  The working conditions necessary to support such a claim are "even more egregious than the high standard for hostile work environment because... an employee is expected to remain employed while seeking redress."  Herron v. DaimlerChrysler, 388 F.3d 293, 303 (7th Cir. 2004).

The  conduct of Hancock (which is the only basis for the surviving harassment claim) does not rise to the level of "even more egregious".  First, at the time of his demotion, Hancock had not been Nguyen's supervisor for over 2 months.  In other words, at the time Nguyen stopped working immediately following his demotion, the conduct that he claims was hostile had ceased.

Second, an employee who takes vacation time and medical leave and then never returns to work cannot claim that his employer constructively discharged him.  There is no question that Nguyen was unhappy about his demotion, but there is also no question that any separation of Nguyen from the employ of defendant was solely a decision made by Nguyen.  Summary judgment is therefore allowed as to the constructive discharge claim.

## CONCLUSION

For each of the reasons stated herein and to the extent stated herein, the motion for summary judgment is granted and the motion to strike is denied.  That leaves the claim of hostile work environment while Hancock was Plaintiff's supervisor as the sole remaining

viable claim.  The final pretrial conference and jury trial remain as currently scheduled for that claim.

ENTER this 6th day of October 2005.

s/ John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE